Jehan A. Patterson
D. Jean Veta (*admitted pro hac vice*)
Nikhil V. Gore (*admitted pro hac vice*)
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
jpatterson@cov.com

*Attorneys for Defendant*
*Lakeland Bank*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> *Plaintiff*, <br><br> v. <br><br> LAKELAND BANK, <br><br><br> *Defendant*. | Case No. 2:22-cv-5746-CCC-SDA |

## <u>DEFENDANT'S MEMORANDUM IN OPPOSITION TO MOTION FOR LEAVE TO PARTICIPATE AS *AMICI CURIAE*</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................ 1

LEGAL STANDARD ....................................................................................... 8

ARGUMENT ................................................................................................... 9

    A.    Partiality and Interest .......................................................... 10

    B.    Representation of *Amici*'s Interest. .................................... 15

    C.    Usefulness of the Briefing. .................................................. 16

CONCLUSION ................................................................................................ 19

CERTIFICATE OF COMPLIANCE .................................................................. 20

CERTIFICATE OF SERVICE ......................................................................... 21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. College of Obstetricians and Gynecologists v. FDA*,
  467 F. Supp. 3d 282 (D. Md. 2020)....................................................................15

*In re Axon Vievu Antitrust Litig.*,
  2025 WL 366751 (D.N.J. Jan. 31, 2025)...................................................8, 11, 16

*Bureau of Consumer Fin. Prot. v. Townstone Fin.*,
  No. 20-cv-4176, ECF 152 (N.D. Ill. June 12, 2025) ....................................17, 18

*Citizens for Responsibility and Ethics in Washington v. FEC*,
  892 F.3d 434 (D.C. Cir. 2018)...........................................................................14

*Corrie v. Caterpillar, Inc.*,
  503 F.3d 974 (9th Cir. 2007) .............................................................................13

*Dobson Mills Apartments, L.P. v. City of Philadelphia*,
  2022 WL 558348 (E.D. Pa. Feb. 23, 2022) .......................................................11

*Evanston Ins. Co. v. Rodriguez Eng'g Lab'ys*,
  2023 WL 379277 (W.D. Tex. Jan. 20, 2023) .....................................................12

*Harris v. Pernsley*,
  820 F.2d 592 (3d Cir. 1987) ..............................................................................17

*Heckler v. Chaney*,
  470 U.S. 821 (1985)...........................................................................................14

*Liberty Lincoln Mercury, Inc. v. Ford Marketing Corp.*,
  149 F.R.D. 65 (D.N.J. 1993)..............................................................................11

*Liberty Resources, Inc. v. Phila. Housing Auth.*,
  395 F. Supp. 2d 206 (E.D. Pa. 2005).................................................................17

*Nat'l Treasury Emps. Union v. Vought*,
  2025 WL 942772 (D.D.C. Mar. 28, 2025), *administrative stay
  granted*, 2025 WL 996856 (D.C. Cir. Apr. 3, 2025) ...........................................14

*Neonatology Assocs., P.A. v. Comm'r of Internal Revenue*,
  293 F.3d 128 (3d Cir. 2002) ...............................................................................11

*New Jersey Prot. & Advoc., Inc. v. Twp. of Riverside*,
  2006 WL 2226332 (D.N.J. Aug. 2, 2006) .........................................................17

*Sciotto v. Marple Newton Sch. Dist.*,
  70 F. Supp. 2d 553 (E.D. Pa. 1999) .......................................................10, 11, 15

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
  581 U.S. 433 (2017) ............................................................................................13

*United States v. Alkaabi*,
  223 F. Supp. 2d 583 (D.N.J. 2002) .............................................................8, 15, 16

*United States v. Ameris Bank*,
  No. 3:23-cv-1232 (M.D. Fla. May 20, 2025) .....................................................6

*United States v. Bancorpsouth Bank*,
  No. 16-cv-118 (N.D. Miss. Jan. 27, 2020) ..........................................................6

*United States v. California*,
  2018 WL 1993937 (E.D. Cal. Apr. 27, 2018) ....................................................15

*United States v. ESSA Bank & Trust*,
  No. 2:23-cv-2065 (E.D. Pa. June 17, 2025) .......................................................17

*United States v. First Merchants Bank*,
  No. 19-cv-2365 (S.D. Ind. Dec. 28, 2022) ..........................................................6

*United States v. Toyota Motor Credit Corp.*,
  No. 2:16-cv-725 (C.D. Cal. May 14, 2018)..........................................................6

*United States v. Trustmark Nat'l Bank*,
  No. 2:21-cv-2664 (W.D. Tenn. May 21, 2025)....................................................5

*United States v. Union Sav. Bank*,
  No. 16-cv-1172 (S.D. Ohio Feb. 21, 2020) ...........................................................6

*Wayte v. United States*,
  470 U.S. 598 (1985).........................................................................................14

*Yip v. Pagano*,
  606 F. Supp. 1566 (D.N.J. 1985) ..................................................................9, 13

**Rules**

Fed. R. App. P. 29 ...............................................................................................8

Fed. R. Civ. P. 60(b) ..........................................................................................16

**Other Authorities**

Stephen G. Masciocchi, *What Amici Curiae Can and Cannot Do with
Amicus Briefs*, 46 Colo. Lawyer 23 (Apr. 2017) .................................................13

## INTRODUCTION

On September 27, 2022, Defendant Lakeland Bank ("Lakeland") entered into a consent order with the United States Department of Justice to resolve historical concerns with respect to redlining. The next day, the United States filed both a complaint initiating this case and the proposed consent order agreed to by both Lakeland and the United States. ECF 1, 2. The day after (September 29, 2022), the Court entered the agreed-upon consent order ("the Consent Order"). ECF 4.

From then through to today—including following Lakeland's merger on May 16, 2024, with Provident Bank ("Provident" and, collectively with Lakeland, the "Bank")—the Bank's record of compliance has been exemplary. Not once has the Department of Justice raised compliance concerns to the Bank. And, even after the Department determined that early termination of the Consent Order was warranted based on substantial compliance, the Bank readily agreed in writing to continue to spend down the full amount of the Consent Order's loan subsidy fund. *See* Declaration of Roxanne Camejo ("Camejo Decl.") ¶ 8; *id.* Ex. 1.

Based on this record of compliance—and the Bank's continued commitment to compliance—the United States filed an unopposed motion to terminate the Consent Order. ECF 9. Proposed *amici*, three advocacy organizations with fair

1

housing-related missions, then moved for leave to file an *amicus* brief criticizing the United States' motion to terminate.  ECF 10.

The Court should deny the *amicus* motion and grant the United States' unopposed motion to terminate.  There is no role for *amici* where, as here, a party has settled a case with a government enforcement agency, has complied with the terms of that settlement, and the government agency exercises its enforcement discretion to terminate the order encompassing the settlement before the expiration of the order's full term.  Early termination has long been commonplace in these circumstances.  The *amicus* brief reflects a disagreement not over the specific circumstances of this case, but rather over the appropriate prioritization of Justice Department resources between fair lending and other enforcement priorities.  That generalized policy dispute is not a fight in which the Bank should be required to engage—nor is it one that this Court need adjudicate.

## FACTUAL BACKGROUND

Since entry of the Consent Order, the Bank has continuously prioritized compliance with the Order's terms.

The principal financial commitment in the Consent Order is a $12 million loan subsidy fund.  ECF 4 ¶¶ 23–26.  The Bank already has invested $6.7 million of the required $12 million loan subsidy fund to increase credit for applicants for home

2

mortgage loans, home improvement loans, and home refinance loans in majority-Black and Hispanic census tracts in the Newark Lending Area; as noted, the Bank will invest the remainder of the required amount whether or not the Consent Order is terminated.  Camejo Decl. ¶¶ 5, 8; *id.* Ex. 1.

The Bank has also gone above and beyond the terms of the Order to ensure the success of its loan subsidy commitment.  For example, to attract borrowers who qualify for the loan subsidy fund, the Bank has developed a special purpose credit program through which it lends at below-market interest rates.  Camejo Decl. ¶ 6. As a result of these efforts, as of April 1, 2025, 451 residential mortgage loans had received support from the loan subsidy fund.  *Id.*

The borrowers on these loans receive benefits far in excess of the $15,000 maximum per-loan amount that can be credited against the subsidy fund. *See* Consent Order, ECF 4 ¶ 24.  Borrowers currently in the special purpose credit program benefit from an average interest rate reduction of 1.4% below market rate (yielding an estimated average savings per loan of approximately $140,000 over the life of the loan).  Camejo Decl. ¶ 7.  They can expect an average additional private-mortgage-insurance savings per loan of approximately $10,000, bringing the total average savings per loan to more than $150,000.  *Id.*  These savings are in addition to the $15,000 down payment and/or closing cost assistance that is credited against

3

the loan subsidy fund. *Id.* At current interest rates, the total cost of these loans over eight years (the average life of a mortgage loan in the Bank's portfolio) will be approximately $71 million. *Id.* ¶ 6.

The Consent Order also required the Bank to open two bank branches in majority-Black and Hispanic census tracts in Newark, New Jersey, and in the Newark Lending Area, by March 29, 2024. *See* ECF 4 ¶¶ 3–4, 20. In part because of delays associated with obtaining the necessary permits to renovate and construct the Newark branch, the Bank timely obtained extensions from the Department of Justice to satisfy this requirement. Camejo Decl. ¶ 9. The Bank opened its Newark branch on April 23, 2025, and held a grand opening ceremony on June 3, 2025, which was attended by many community stakeholders, including one of the proposed *amici* here. *Id.* The Bank satisfied the requirement to open a branch in a majority-Black and Hispanic census tract in the broader Newark Lending Area through Lakeland's merger with Provident, which maintains several branches throughout that area. *Id.*

The Consent Order also requires that the Bank annually evaluate its Advertising, Outreach, and Education Plan, under which the Bank must spend at least $150,000 each year during its term on advertising, outreach, consumer financial education, and credit counseling in the Newark Lending Area. *See* ECF 4 ¶¶ 30, 32.

4

And it requires the Bank to evaluate annually its Community Development Partnership Program, which provides that the Bank will spend a minimum of $400,000 through partnerships established with community-based or governmental organizations that provide residents of majority-Black and Hispanic census tracts in the Newark Lending Area with services relating to credit, financial education, homeownership, and foreclosure prevention to increase access to home mortgage credit. *See* ECF 4 ¶ 29. To date, the Bank has fully complied with its advertising and outreach commitments and has delivered funds to over twenty Community Development Partners totaling approximately $175,000. Camejo Decl. ¶ 12. Provident intends to continue these activities even if the Order is terminated early. *Id.* ¶¶ 12, 15.

Finally, the Consent Order requires the Bank to provide training on an annual basis on the Bank's compliance with the FHA, ECOA, Regulation B, and the Bank's obligations under the Consent Order. *See* ECF 4 ¶ 10. Once again, the Bank has complied with this obligation and has no intention of ceasing these trainings, even if the Consent Order is terminated early. Camejo Decl. ¶ 11.

The Bank's record of compliance and its commitment to ongoing compliance make the Consent Order an obvious candidate for early termination—consistent with many other early terminations pursued by both current and prior administrations,

5

and approved by courts. *See, e.g.*, *United States v. Trustmark Nat'l Bank*, No. 2:21-cv-2664, ECF 29 (W.D. Tenn. May 21, 2025); *United States v. Ameris Bank*, No. 3:23-cv-1232, ECF 16 (M.D. Fla. May 20, 2025); *United States v. First Merchants Bank*, No. 19-cv-2365, ECF 15 (S.D. Ind. Dec. 28, 2022); *United States v. Union Sav. Bank*, No. 16-cv-1172, ECF 7 (S.D. Ohio Feb. 21, 2020); *United States v. Bancorpsouth Bank*, No. 16-cv-118, ECF 17 (N.D. Miss. Jan. 27, 2020); *United States v. Toyota Motor Credit Corp.*, No. 2:16-cv-725, ECF 25 (C.D. Cal. May 14, 2018).

In opposing early termination, *amici* do not challenge Provident's good faith or its commitment to its community. To the contrary, the Director of Community Reinvestment at proposed *amicus* New Jersey Citizen Action Education Fund ("NJCA"), who submitted a declaration in support of *amici*'s proposed brief (ECF 10-4), issued a press release two days later "applaud[ing] Provident Bank's continued commitment to underserved communities" and expressing confidence that NJCA would "continu[e] to work with Provident" on promoting home ownership in

6

underserved communities.[1]  Nevertheless, NJCA states that it is "fiercely opposed to the Trump Administration's efforts to terminate the consent order[.]"[2]

At bottom, what *amici* oppose is a set of policy directives that they characterize as "eliminating federal fair housing enforcement."[3]  They filed this brief to "respon[d] to" what they view as "a troubling nationwide effort to weaken fair housing enforcement."[4]  And they characterize the issue presented as whether "the federal government will honor its role in dismantling structural racism in the housing market."[5]  *Amici* further assert that "the Trump Administration's efforts to terminate the [Consent Order] sends a clear message to financial institutions that it will not hold banks accountable for discriminatory redlining practices."[6]  In sum, this is a

---

[1] *New Jersey Citizen Action applauds Provident Bank's continued commitment to underserved communities*, Insider NJ (June 3, 2025), https://www.insidernj.com/press-release/new-jersey-citizen-action-applauds-provident-banks-continued-commitment-to-underserved-communities/.

[2] *Id.*

[3] *See Fair Housing Month Begins Amid National Assault on Fair Housing*, National Fair Housing Alliance (Apr. 3, 2025), https://nationalfairhousing.org/fair-housing-month-begins-amid-national-assault-on-fair-housing/.

[4] *Philadelphia Civil Rights Groups Push Back on Department of Justice Attempt to Terminate Redlining Case in Philadelphia*, National Fair Housing Alliance (June 12, 2025), https://nationalfairhousing.org/philadelphia-civil-rights-groups-push-back-on-department-of-justice-attempt-to-terminate-redlining-case-in-philadelphia/.

[5] *Id.*

[6] *New Jersey Citizen Action condemns Trump DOJ decision to terminate Lakeland Bank's consent order*, New Jersey Citizen Action (June 2, 2025), https://www.njcitizenaction.org/new_jersey_citizen_action_condemns_trump_doj_decision_to_terminate_lakeland_bank_s_consent_order.

generalized disagreement with Department of Justice enforcement priorities—a disagreement that is not Provident's fight and, as set out below, cannot properly be adjudicated before this Court.

## LEGAL STANDARD

In deciding whether to admit a prospective *amicus curiae*, courts in this District consider whether: "(1) the amicus has a 'special interest' in the particular case; (2) the amicus' interest is not represented competently or at all in the case; (3) the proffered information is timely and useful; and (4) the amicus is not partial to a particular outcome in the case."  *In re Axon Vievu Antitrust Litig.*, 2025 WL 366751, at *9 n.4 (D.N.J. Jan. 31, 2025) (quotation omitted); *see also* Fed. R. App. P. 29(a)(3) (to file a brief, an *amicus* must show that: (i) *amicus* has a sufficient "interest" in the case, (ii) the brief is "desirable," and (iii) the brief discusses matters that are "relevant to the disposition of the case"); *United States v. Alkaabi*, 223 F. Supp. 2d 583, 592 (D.N.J. 2002) (district courts look to Fed. R. App. P. 29 for guidance because "there is no rule governing the appearance of an amicus curiae in the United States District Courts").

## ARGUMENT

The above factors weigh against *amicus* participation in this case.[7]  The Court is called upon here to terminate a Consent Order in circumstances where:  the termination motion is unopposed; it is uncontested that the Bank has fully complied with the Order for almost three years (subject to duly obtaining extensions of time from the Department of Justice with respect to one of the Order's requirements); everyone accepts that the Bank has acted in good faith since the Order came into force; and the Bank has undertaken in writing to the Department of Justice (and now to this Court) to continue to comply with the key provisions of the Order notwithstanding early termination.

In these circumstances, *amicus* briefing would offer no assistance to the Court. Instead, the proposed brief presents serious partiality concerns, fails to identify an appropriate interest supporting *amicus* participation, and is unlikely to be useful in resolving the legal questions raised by the United States' unopposed motion to terminate.

---

[7] The argument herein addresses the appropriateness of admitting the proposed *amicus* brief.  As noted in the Bank's June 12 letter to the Court, ECF 13, in the event the Court grants the motion for leave to appear *amicus curiae* and admits the *amicus* brief, the Bank requests an opportunity at that time to submit a written response to the merits arguments in the brief.

**A.      Partiality and Interest.**

Under this Court's case law, *amici* must walk a line between avoiding partiality as to the outcome of a particular case and demonstrating a relevant "special interest" in the legal issues presented.  *See Yip v. Pagano*, 606 F. Supp. 1566, 1568 (D.N.J. 1985) (distinguishing between an *amicus* brief from a business group "directly affected by the court's ruling," and a brief from a group of legislators with an indirect interest and substantial expertise on complex questions of "legislative immunities").  Here, the proposed *amici* are partial to a particular outcome, but their partiality results from a broad and non-justiciable policy difference about the appropriate prioritization of enforcement resources, not from any cognizable interest or special legal expertise pertaining to this specific case.

The term "*amicus curiae* has historically been used to describe an impartial individual who suggests the interpretation and status of the law, gives information concerning it, and whose function is to advise in order that justice may be done, rather than to advocate a point of view so that a cause may be won by one party or another."  *Sciotto v. Marple Newton Sch. Dist.*, 70 F. Supp. 2d 553, 554 (E.D. Pa. 1999).  Here, however, proposed *amici* make no secret of their partiality, *see* Mem. in Supp. of Mot. for Leave to Participate as *Amici Curiae*, ECF 10-2, at 9, styling their proposed brief as an "opposition to [the] unopposed motion to terminate" and

10

arguing that the Court should deny the United States' unopposed motion, ECF 10-3, at 17.  One *amicus* appears to believe (albeit incorrectly) that it may have a financial interest in the case.[8]  This partiality carries over to *amici*'s public statements.  *See supra* pp. 6–7.  It also carries over to their filings in other cases:  *amici*'s proposed brief in this case is substantially similar to the one filed by *amici*'s counsel in *United States v. ESSA Bank & Trust*, No. 2:23-cv-2065, ECF 9-3 (E.D. Pa. filed June 9, 2025).

*Amici*'s partiality militates against admission of their brief.  *See, e.g.*, *In re Axon Vievu Antitrust Litig.*, 2025 WL 366751, at *9 n.4 (denying *amicus* participation by a federal agency when it had raised similar claims against a party in other fora); *Liberty Lincoln Mercury, Inc. v. Ford Marketing Corp.*, 149 F.R.D. 65, 82 (D.N.J. 1993) ("When the party seeking to appear as amicus curiae is perceived to be an interested party or to be an advocate of one of the parties to the litigation, leave to appear amicus curiae should be denied."); *Sciotto*, 70 F. Supp. 2d at 555–56 (denying *amicus* participation based on potential indirect pecuniary interest);

---

[8] The Director of Community Reinvestment at NJCA states in her declaration that NJCA has "receiv[ed] modest grants pursuant to the Consent Order's Community Development Partnership Program."  Amirhamzeh Decl., ECF 10-4 ¶ 7.  The Consent Order does not require the Bank to make grants to any specific community groups.  Provident and Lakeland began making annual contributions to NJCA before entry of the Consent Order.  Camejo Decl. ¶ 13.

*Dobson Mills Apartments, L.P. v. City of Philadelphia*, 2022 WL 558348, at *2 (E.D. Pa. Feb. 23, 2022) (same); *compare Neonatology Assocs., P.A. v. Comm'r of Internal Revenue*, 293 F.3d 128, 133–34 (3d Cir. 2002) (single judge opinion by Alito, J.) (admitting an *amicus* brief despite partiality concerns, in the appellate context, where *amici* did not "inject new issues into the case" and were "primarily interested in making sure that our court does not inadvertently stray into issues that need not be decided").

*Amici*'s partiality also raises significant procedural concerns. *Amici* spend fully half of their brief (excluding the introduction and statement of interest) providing the Court with purported factual background on the history and specifics of this case and what are framed as related "Trump Administration" policy decisions with which they disagree. ECF 10-3, at 2–9. The six pages of legal argument similarly make case-specific assertions about what the United States has "alleged" here, what the parties "would have expected when they entered into a consent order," and the asserted impact of the Order on the local community. *Id.* at 12, 15.

These case-specific, partisan assertions are inaccurate in some respects.[9] Equally important, they are improper. They reflect an attempt by an outside party

---

[9] *Compare* Amirhamzeh Decl., ECF 10-4 ¶ 10 ("[W]ithout the Consent Decree there is no guarantee that the loan subsidy program will continue"), *with* Camejo Decl. (continued…)

to generate a factual record, after the case has been closed for most purposes, and without subjecting itself to discovery and adversarial testing. That is not a role appropriate for *amici*.[10] Instead, it reflects an attempt to provide outcome-determinative briefing to directly affect the parties' legal obligations without meeting the conditions for participation as an intervening party, including constitutional conditions such as Article III standing. *See Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 435 (2017) ("[A]n intervenor must meet the requirements of Article III if the intervenor wishes to pursue relief not requested by a plaintiff.").

---

¶ 8; *id.* Ex. 1 (Provident committing in writing to spend down the full $12 million loan subsidy); *compare* Amirhamzeh Decl., ECF 10-4 ¶ 6 ("Without the Consent Order in place there is no assurance that [Provident's new Newark branch] will be supported by Lakeland/Provident and remain open in the future particularly given that New Jersey has had some of the highest rates of bank branch closures in the nation."), *with* Camejo Decl. ¶ 10 (explaining that "Provident cannot exit [its 10-year branch lease] without significant financial consequences (nor does it intend to)").

[10] "An amicus who argues facts should rarely be welcomed." *See Evanston Ins. Co. v. Rodriguez Eng'g Lab'ys*, 2023 WL 379277, at *1 (W.D. Tex. Jan. 20, 2023) (citing *Strasser v. Doorley, Jr. et al.*, 432 F.2d 567 (1st Cir. 1970)); *see also Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 978 & n.3 (9th Cir. 2007) (*amicus* briefs that seek to "introduce new facts at the appellate stage" are generally disfavored); Stephen G. Masciocchi, *What Amici Curiae Can and Cannot Do with Amicus Briefs*, 46 Colo. Lawyer 23, 25 (Apr. 2017) ("[W]hile courts will allow amici to present empirical studies, statistics, social scientific theories, and historical information, they will not allow amici to present case-specific evidence about what the parties did, when, and how." (footnote omitted)).

While partial to a specific outcome, *amici* lack a cognizable "special interest" in the case.  They do not demonstrate, for example, how termination of this specific Consent Order will undermine their "decades-long history of working to ensure that housing and lending markets of New Jersey, Pennsylvania, and the nation are free from discrimination."  ECF 10-2, at 4; *cf. Yip*, 606 F. Supp. at 1568 (recognizing legislators' "compelling" interest in matter because "[a]ny ruling by this Court limiting the scope of [witness] immunity will affect the ability of Congress to obtain adequate information in an efficient manner.").  Their interest, instead, is in changing the Justice Department's enforcement priorities so that more resources are devoted to "us[ing] the power of foundational civil rights statutes to remediate the scourge of discrimination."  ECF 10-2, at 6.

*Amici*'s goal—affecting the Department's enforcement priorities—cannot be achieved through this Court.  It is well established that "agency decisions to refuse enforcement" are "unsuitab[le] for judicial review" because, among other reasons, it is "peculiarly within [the agency's] expertise" to determine "whether agency resources are best spent on this [alleged] violation or another." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985); *see Wayte v. United States*, 470 U.S. 598, 607 (1985) ("the Government's enforcement priorities[] and [any given] case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of

14

analysis the courts are competent to undertake"); *Citizens for Responsibility and Ethics in Washington v. FEC*, 892 F.3d 434, 438 (D.C. Cir. 2018) (federal agencies "have unreviewable prosecutorial discretion to determine whether to bring an enforcement action"). Even if *amici* sought to establish that this is the rare situation where a court may intervene to compel an agency to fulfill particular functions,[11] this case—which concerns only one enforcement action against one bank—plainly is not a vehicle for that type of relief. Because *amici*'s "potential contributions to the case would come largely at the policy level," their participation is inappropriate. *Sciotto*, 70 F. Supp. 2d at 556.

### B.    Representation of *Amici*'s Interest.

The second factor asks if "the amicus' interest is … represented competently or at all in the case." *Alkaabi*, 223 F. Supp. 2d at 592. For the reasons explained above, *amici* do not have a relevant interest in this case. And to the extent *amici* seek to vindicate the general public interest in the enforcement of federal law, the United States adequately represents that interest. *See, e.g.*, *Am. College of Obstetricians and Gynecologists v. FDA*, 467 F. Supp. 3d 282, 291 (D. Md. 2020)

---

[11] *Cf. Nat'l Treasury Emps. Union v. Vought*, 2025 WL 942772, at *43 (D.D.C. Mar. 28, 2025) (distinguishing "a realignment of priorities"—the type of decision that *Heckler* reserves to agency discretion—from a case where government defendants allegedly "abandon[ed] their statutory obligations" by takings steps to "shut down [an] agency entirely"), *administrative stay granted*, 2025 WL 996856 (D.C. Cir. Apr. 3, 2025).

("When a governmental action is challenged, 'it is difficult to conceive of an entity better situated to defend it than the government[,]'" "particularly where one of [the parties] is the [agency] with the authority and responsibility to protect against the potential dangers [at issue]." (quoting *Stuart v. Huff*, 706 F.3d 345, 351 (4th Cir. 2013))); *United States v. California*, 2018 WL 1993937, at *2 (E.D. Cal. Apr. 27, 2018) ("[T]his sort of general public interest is presumed to be adequately represented by the United States absent a compelling showing to the contrary."). This factor therefore does not apply.

### C.    Usefulness of the Briefing.

The final factor asks whether the proposed *amicus* brief would be helpful to the Court in resolving the legal questions at issue.  *See In re Axon Vievu Antitrust Litig.*, 2025 WL 366751, at *9 n.4; *Alkaabi*, 223 F. Supp. 2d at 592.

*Amici*'s briefing is not useful here for two reasons.  *First*, *amici* have identified no complexity or ambiguity in the law that the Court is unable to resolve without their assistance.  The legal issue discussed in their brief concerns the application of a commonly invoked rule of civil procedure, Fed. R. Civ. P. 60(b), and *amici* claim no special competence in matters of civil procedure.  Moreover, as noted, their brief is not primarily about the law at all.

16

*Second*, *amici*'s briefing elides the consequence of the outcome that *amici*— and *amici* alone—seek to have the Court mandate.  The consequence would be to require the Department of Justice to continue to devote scarce enforcement resources to overseeing a settlement with a fully compliant party that has made continued compliance commitments that the Department has evaluated and found reliable.  As explained *supra* (pp. 14–15), that result intrudes upon the Department's enforcement discretion, and *amici* have no role to play in second-guessing the considered exercise of such discretion.  The Bank is not aware of any previous court finding an *amicus* submission useful in these circumstances—and *amici* have identified none.[12]

*Amici*'s supplemental authority, ECF 18, likewise misses the mark.  *Amici* point to an Illinois district court's decision to deny a motion to vacate a consent order in *Bureau of Consumer Fin. Prot. v. Townstone Fin.*, No. 20-cv-4176, ECF 152

---

[12] In *ESSA Bank & Trust*, No. 2:23-cv-2065, ECF 12 (E.D. Pa. June 17, 2025), the court in a single-page, unreasoned order granted *amici*'s motion for leave to participate; no party filed a motion opposing the filing of that *amicus* brief.

The examples cited by *amici* in arguing that their proposed brief would assist the Court, ECF 10-2, at 5–6, are inapposite.  None involved challenges to the considered exercise of government enforcement discretion, and their disparate facts present no parallel to the unopposed motion here.  *See Liberty Resources, Inc. v. Phila. Housing Auth.*, 395 F. Supp. 2d 206, 209 (E.D. Pa. 2005) (*amicus* tenants' association sought to protect the otherwise-unrepresented privacy interests of residents of section 8 housing); *New Jersey Prot. & Advoc., Inc. v. Twp. of Riverside*, 2006 WL 2226332 (D.N.J. Aug. 2, 2006) (denying the motion for leave to appear *amicus curiae* after concluding that the movant did not address one of the key legal issues in dispute); *Harris v. Pernsley*, 820 F.2d 592 (3d Cir. 1987) (appropriate for district attorney to be heard in a prison conditions case, where relief may have affected his office's prosecutions).

17

(N.D. Ill. June 12, 2025), where the court had admitted *amicus* briefing, *see id.*, ECF 149 (N.D. Ill. Apr. 8, 2025). But the facts underpinning the *Townstone* case are in stark contrast to those before this Court: *Townstone* involved "unprecedented" and "breathtaking" assertions that the enforcement action was initiated as a result of substantial misconduct by government attorneys. *See, e.g.*, *Townstone*, ECF 152, at 10 (noting that a government declarant stated that CFPB lawyers had misled their superiors into pursuing the action against Townstone); *id.* at 13 (government arguing that the lawsuit, from the beginning, "lacked a legal or factual basis"). Moreover, the parties in *Townstone* sought to vacate the judgment, effectively reversing that court's earlier ruling rather than merely shortening the period of the consent order's application—a critical distinction that *amici* ignore. Notice of Suppl. Authority, ECF 18, at 3 (quoting *Townstone*, ECF 152, at 12, 14).

Where, as here, the United States moves to end an enforcement order early based on standard, fact-specific considerations such as a defendant's exemplary record of compliance, *amicus* participation serves no purpose. *See* Unopposed Mot. to Terminate, ECF 9, at 2 (the United States citing the Bank's "commitment to remediation," "substantial compliance" with the Consent Order, and commitment to continuing disbursement of the loan subsidy fund).

18

## CONCLUSION

This Court is not the right forum to resolve a policy dispute between the Department of Justice and advocacy groups that disagree with the Department's enforcement priorities—and Provident should not be ensnared in that fight. Instead, the Court should deny the motion for leave to appear *amicus curiae* and grant the United States' unopposed motion for termination.

June 23, 2025                          Respectfully submitted,


                                       *s/ Jehan A. Patterson*
                                       Jehan A. Patterson
                                       D. Jean Veta (*admitted pro hac vice*)
                                       Nikhil V. Gore (*admitted pro hac vice*)
                                       COVINGTON & BURLING LLP
                                       850 Tenth Street NW
                                       Washington, DC 20001-4956
                                       (202) 662-6000
                                       jpatterson@cov.com
                                       jveta@cov.com
                                       ngore@cov.com

                                       *Attorneys for Defendant Lakeland Bank*

19

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Memorandum in Opposition to Motion for Leave to Participate as *Amici Curiae* complies with the requirements of Local Civil Rule 7.2. This Memorandum contains 19 pages of double-spaced text (excluding the tables of contents and authorities), prepared with 14-point Times New Roman typeface.

By: *s/ Jehan A. Patterson*
Jehan A. Patterson

DATED: June 23, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2025, a copy of this Memorandum in Opposition to Motion for Leave to Participate as *Amici Curiae* and supporting papers were served via ECF upon all counsel of record.

By: *s/ Jehan A. Patterson*
Jehan A. Patterson

DATED: June 23, 2025