# Exhibit A

*United States v. ESSA Bank & Trust*, 2:23-cv-02065, ECF No. 20, slip op. (E.D. Pa. July 23, 2025)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| **UNITED STATES OF AMERICA,**<br>*Plaintiff,*<br><br>**v.**<br><br>**ESSA BANK & TRUST,**<br>*Defendant.* | **CIVIL ACTION**<br><br>**NO. 23-2065** |
|---|---|

**Baylson, J.** **July 23, 2025**

**MEMORANDUM RE: MOTION TO TERMINATE CONSENT ORDER**

In a Complaint filed on May 31, 2023, the United States of America ("U.S.") alleged that ESSA Bank & Trust ("ESSA") had engaged in unlawful discriminatory residential mortgage lending practices in violation of federal law. Compl. ¶ 1, ECF 1. Shortly after, the parties filed a Consent Order, which was endorsed by the Court. ECF 6. In the present motion, the U.S. seeks to, without ESSA's opposition, terminate the Consent Order and dismiss the action. ECF 8.

Federal Rule of Civil Procedure 60(b) permits relief from a judgment only under narrow circumstances and sets a high bar to do so because final judgments serve a vital role in ensuring stability, predictability, and respect for the judicial process. See Gonzalez v. Crosby, 545 U.S. 524, 535 (2005) (quoting Liljeberg v. Health Servs. Acq. Corp., 486 U.S. 847, 873 (Rehnquist, C. J., dissenting)).[1] Continued enforcement of the Consent Order is essential to remedy ESSA's alleged discrimination against Black and Hispanic communities in the Philadelphia area and to fulfill federal laws combating discrimination and ensuring fair, equal access to credit for all

---

[1] While the Court can only speculate as to the U.S.' motivations for filing its motion, the Court emphasizes that consent orders are final judicial determinations—not mere policy statements subject to reversal at the discretion of a changing Executive Administration. The integrity of the judicial process and public confidence in the rule of law remain paramount.

communities. For the reasons stated below, the Motion to Terminate the Consent Order, ECF 8, is **DENIED**.

## I. FACTUAL ALLEGATIONS AND RELEVANT HISTORY

### A. Allegations in the Complaint

On May 31, 2023, the U.S. filed a Complaint against ESSA Bank & Trust ("ESSA") under the Fair Housing Act and the Equal Credit Opportunity Act alleging unlawful discrimination in ESSA's residential mortgage lending practices. Compl. ¶ 1, ECF 1. The Complaint alleged that from 2017 through at least 2021, ESSA engaged in a pattern or practice of unlawful redlining in the Philadelphia Metropolitan Statistical Area by avoiding providing home loans and mortgage services in majority Black and Hispanic neighborhoods within its lending area and engaging in practices to discourage those residents from applying for credit.[2] Id. ¶ 4. An FDIC examination concluded that there was reason to belief ESSA had engaged in a pattern or practice of redlining and referred the matter to the Department of Justice. Id. ¶¶ 31–34.

The Complaint alleged that ESSA deliberately excluded Philadelphia County from the Community Reinvestment Act assessment area, which led to the omission of majority-Black and Hispanic census tracts in West Philadelphia from the Community Reinvestment Act area. Id. ¶¶ 24–30. Moreover, ESSA allegedly failed to adequately staff its branches closest to majority-Black and Hispanic neighborhoods in the Philadelphia Metropolitan Service Area and employed no

---

[2] "Redlining," according to the U.S.' Complaint, occurs when "based on the race, color, or national origin of a neighborhood's residents, lenders discourage applications for home loans and other credit services, deny equal access to home loans and other credit services, or avoid providing home loans and other credit service." ECF 1 at ¶ 3; see Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc., 576 U.S. 519, 529 (2015) (discussing redlining); see generally Richard Rothstein, The Color of Law: A Forgotten History of How Our Government Segregated America (2017).

nonwhite or bilingual loan officer. Id. ¶¶ 35–40. The Complaint also alleged that ESSA's marketing excluded majority-Black and Hispanic neighborhoods, instead intentionally targeting predominantly majority-white census tracts. Id. ¶¶ 41–46. In addition, the U.S. alleged that ESSA's Community Home Buyer Program was restricted to its Community Reinvestment Act assessment area and thus was unavailable to residents of the excluded majority-Black and Hispanic census tracts. Id. ¶¶ 48–51.

**B. Terms of the Consent Order**

On June 9, 2023, the Court entered a Consent Order resolving all claims between the U.S. and ESSA. The Consent Order states it is effective for five years or longer if ESSA has not fully invested the loan subsidy fund amount. The Court retained jurisdiction to enforce the Order for up to two years, and modifications require Court approval by motion. ECF 6 at 1, ¶¶ 49–50, 53, 62. The terms of the Consent Order are summarized below.

***Fair Lending Compliance.*** ESSA agreed to assess its fair lending program with a focus on majority-Black and Hispanic census tracts, produce a written report, and submit a Fair Lending Status Report and Compliance Plan ("Plan") to the U.S. describing policy revisions, training, monitoring procedures, and steps to comply with federal law. Id. ¶¶ 5–7.

***Fair Lending Training.*** ESSA agreed to distribute the Complaint and Consent Order to relevant staff and officials (including those hired after the Consent Order's Effective Date), offer opportunities for questions, and report acknowledgments to the U.S. Id. ¶ 8. ESSA agreed to provide annual fair lending trainings, deliver acknowledgments within 30 days of training completion, and bear all training costs. Id. ¶¶ 9– 10, 12.

***Community Credit Needs Assessment.*** ESSA agreed to submit a Community Credit Needs Assessment and present it to all ESSA committees responsible for overseeing fair lending compliance with a plan outlining actions and timelines to fulfill the Consent Order. Id. ¶¶ 13–16.

***Personnel.*** ESSA agreed to appoint and maintain a Community Development Officer to oversee lending efforts and outreach in target tracts and to hire two mortgage loan officers based in its Upper Darby or Lansdowne branches to solicit mortgage applications. Id. ¶¶ 18–19.

***Loan Subsidy Fund.*** ESSA agreed to invest at least $2.92 million in a loan subsidy fund to create access to mortgage, home improvement, and refinance loans in majority-Black and Hispanic tracts. Id. ¶¶ 20, 23.

***Community Programs.*** ESSA agreed to expand eligibility for its Community Home Buyer Program to cover the Covered Lending Area and partner with organizations near the Upper Darby and Lansdowne branches and spend at least $125,000.00 to improve mortgage credit access. Id. ¶¶ 24–25. ESSA agreed to submit partnership proposals to the U.S. and report on them annually. Id. ¶¶ 26–27. ESSA agreed to spend at least $250,000.00 on advertising, outreach, education, and credit counseling, submitting an Outreach Plan within 180 days for U.S. approval, and update it annually. Id. ¶¶ 28–30. ESSA agreed to advertise mortgage products to majority-Black and Hispanic census tracts at least as much as majority-white tracts, distribute targeted branch materials, and include equal housing statements in all advertising. Id. ¶¶ 31–33. ESSA agreed to offer two annual outreach programs for real estate professionals and at least two annual consumer financial education seminars for residents and maintain a website section dedicated to majority-Black and Hispanic census tracts near Upper Darby and Lansdowne. Id. ¶¶ 34–37, 40.

***Monitoring.*** ESSA agreed that, annually, within 30 days of submitting data as required under the Home Mortgage Disclosure Act, it would provide this data to the U.S. Id. ¶ 42. ESSA agreed to submit annual compliance reports to the U.S., including assessments, explanations for shortfalls, and recommendations. Id. ¶ 43.

***Fair Lending Committee.*** ESSA created a Fair Lending Committee to coordinate CRA-focused loan portfolio expansion and increase loan applications from low-to-moderate income and majority-minority communities within the CRA Assessment Area. Id. ¶ 45. ESSA agreed that the Fair Lending Committee would review Consent Order-related submissions and monitor ESSA's compliance with the Consent Order. Id. ¶¶ 46–47. ESSA agreed to require the Committee to provide quarterly updates to the Board, covering lending performance in majority-Black and Hispanic census tracts, community outreach efforts, and financial education. Id. ¶ 48.

**C. Motion to Terminate the Consent Order**

On June 6, 2025, the U.S. filed an "uncontested" motion to terminate the Consent Order and dismiss the action with prejudice (the "Motion"). ECF 8. In the Motion, the U.S. argues ESSA has demonstrated a commitment to remediation, fully disbursed the loan subsidy fund, and is "substantially" in compliance with the Consent Order's other terms. ECF 8 at 1–2.

On June 9, 2025, then-proposed amici curiae Housing Equality Center of Pennsylvania, POWER Interfaith, and the National Fair Housing Alliance—organizations that seek to eradicate discrimination and increase opportunities for Pennsylvania citizens—sought leave to file an amicus brief,[3] which was granted on June 17, 2025. ECF 12. On the same day, the amici filed a

---

[3] While amici must have a special interest in the litigation, they need not satisfy the Article III standing requirements because they are non-parties. See Michael K. Lowman, The Litigating Amius Curiae: When Does the Party Begin After the Friends Leave?, 41 Am. U. L. Rev. 1243, 1259–60 (1992) (noting that limits on what amici can do result from lack of standing). Amici need only "satisfy the standards for filing a brief as an amici." Neonatology Assocs., P.A. v. Comm'r, 293 F.3d 128, 131 (3d Cir. 2002) (Alito, J.).

At oral argument, the Court asked the amici whether they planned to intervene in this case or knew of any proposed intervenors. The amici stated that, given the high bar for intervention, they did not seek to intervene in the case nor did they know of anyone who planned to do so. The amici noted that, hypothetically, if a partnership organization was due funds based on ESSA's obligations under the Consent Order, the organization may have standing to challenge the

brief in opposition to the U.S.' Motion to Terminate. ECF 13. On July 14, 2025, ESSA filed a brief in response. ECF 16. On July 17, 2025, the U.S. filed a brief supporting its Motion. ECF 18. On July 21, 2025, the Court held oral argument. ECF 19.

## II. LEGAL STANDARD

Fed. R. Civ. P. 60(b)(5) permits a party to obtain relief from a judgment or order if, among other things, "[t]he judgment has been satisfied . . . or applying it prospectively is no longer equitable." A district court has discretion to permit such relief under Rule 60. See Waetzig v. Halliburton Energy Servs., Inc., 145 S. Ct. 690, 698 (2025) (noting that Rule 60 (b) provides district courts with "ample discretion"); Cox v. Horn, 757 F.3d 113, 124 (3d Cir. 2014). "[A] party seeking modification [or vacatur] of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." Rufo v. Inmates of Suffolk Cnty. Jail, 502 U.S. 367, 383 (1992). The movant "must establish at least one of the following four factors by a preponderance of the evidence:" "(1) a significant change in factual conditions; (2) a significant change in law; (3) that "a decree proves to be unworkable;" or (4) that "enforcement of the decree without modification would be detrimental to the public interest." Democratic Nat. Comm. v. Republican Nat. Comm., 673 F.3d 192, 202 (3d Cir. 2012) (quoting Rufo, 502 U.S. 384). This is not a "universal formula," and courts should also consider where relevant the circumstances that led to its entry, the nature of the conduct it was intended to prevent, the length of time since its issuance, the extent to which the party bound by it has complied, and the likelihood that the prohibited conduct or harmful conditions will recur if the Consent Order is lifted. See Bldg. & Const. Trades Council of Phila. & Vicinity, AFL-CIO v. N.L.R.B., 64 F.3d

---

termination of the Consent Order, but that this issue was complicated by the fact that those partnership organizations are not parties to or specifically mentioned in in the Consent Order.

880, 888 (3d Cir. 1995) ("BCTC"). In weighing these factors, "the court must balance the hardship to the party subject to the injunction against the benefits to be obtained from maintaining the injunction" and should determine whether the objective has been achieved. Id.

## III. DISCUSSION[4]

Rooted in the mandates of federal law and the protections of the U.S. Constitution, the Consent Order aims to address the lingering effects of ESSA's alleged discriminatory lending practices by requiring ongoing measures to promote credit access in previously excluded majority-Black and Hispanic census tracts. These obligations serve the public interest and remain necessary until the Consent Order's full term is complete. Ensuring equal access to credit is not only a legal mandate—it strengthens communities, serves the public, and advances economic justice. Indeed, the Constitution and federal law continue to prohibit discrimination based on race and national origin, regardless of any change in the Executive Administration.

### A. ESSA's Partial Completion of Certain Obligations Does Not Mean the Consent Order's Purpose Has Been Satisfied

ESSA's partial satisfaction of the Consent Order does not achieve its purpose—to remedy ESSA's previous discriminatory lending practices and promote equal access to mortgage credit to prevent future discrimination. Upholding these commitments serves not only legal compliance, but also the broader public interest in fairness and equity.

---

[4] The U.S. filed its Motion on June 6, 2025, ECF 8, within the two-year period of this Court's jurisdiction to enforce the Consent Order as stated by the terms of the Consent Order. ECF 6 ¶ 62. Even so, this Court has the authority to rule on this Motion since "provisions in a consent decree that give a court the power to modify the decree are merely declaratory of a district court's inherent modification power." Holland v. N.J. Dep't of Corr., 246 F.3d 267, 283 (3d Cir. 2001) (citing United States v. Swift & Co., 286 U.S. 106, 114 (1932)).

The U.S.' assertion that ESSA achieved the purpose of the Consent Order because it fully paid out the subsidy loan fund is unpersuasive.[5] ECF 18 at 7. Several terms of the Consent Order remain unmet and/or require continued compliance over several years, see infra, and are highly relevant to achieving the Consent Order's purpose. See Vazquez v. Carver, 18 F. Supp. 2d 503, 507–08 (E.D. Pa. 1998) (Cahn, C.J.), aff'd, 181 F.3d 85 (3d Cir. 1999) (denying motion to terminate Consent Decree where defendants claimed compliance based on completing prison construction and holding that the Decree's scope was broader than what defendants purported to have satisfied). ESSA's ongoing obligations are not merely ancillary to the Consent Order's purpose considering the four corners of the Consent Order—these obligations were put in place to directly address the exclusion and practices that the Consent Order was designed to remedy.

**B. ESSA Has Not Substantially Complied With the Consent Order**

The U.S. and ESSA's assertion that ESSA has substantially complied with the Consent Order, thereby constituting a significant change in facts, is contrary to the evidence (or lack thereof) before the Court. There are multiple terms of the Consent Order which have not been substantially satisfied, as detailed in the Court's footnote.[6] The Consent Order was designed to

---

[5] The Court will not permit the parties to post-hoc decide that the loan subsidy fund is the "most important" part of the Consent Order. ECF 18 at 9. As the amici raised, the U.S. could have included a clause in the Consent Order—as it has in other Consent Orders—that full satisfaction of the loan subsidy fund would permit early termination of the Consent Order. See, e.g., U.S. v. Union Sav. Bank et al., No. 16-cv-1172 (S.D. Ohio Feb. 21, 2020); U.S. v. BancorpSouth Bank, No. 16-cv-118-MPM-DAS (N.D. Miss. Jan. 27, 2020). It did not do so here.

[6] Based on the Court's review of the Consent Order and ESSA's briefing and its attachments, multiple obligations remain dissatisfied or require years of additional compliance:

***Fair Lending Training.*** ESSA agreed to distribute the Complaint and Consent Order to all staff, including future hires, provide opportunities for questions, and hold annual fair lending trainings. ECF 6 ¶¶ 8–10, 12. ESSA's two years of compliance, ECF 16 at 3, does not amount to substantial compliance with a Consent Order that requires ongoing, annual efforts throughout its five-year term.

vindicate federal antidiscrimination laws on discrimination by requiring ESSA to take concrete, sustained steps to serve all communities fairly. Termination of the Consent Order where ESSA has not substantially complied with its terms undermines those goals, the pursuit of which are undeniably in the public interest.

---

***Personnel.*** ESSA agreed to appoint a Community Development Officer ("CDO") for the duration of the Consent Order. ECF 6 ¶ 18. ESSA's two years of compliance, ECF 16 at 3, does not amount to substantial compliance with a Consent Order that requires the CDO to be in place throughout its five-year term.

***Community Programs.*** ESSA agreed to spend at least $125,000.00 to improve mortgage credit access through community partnerships and at least $250,000.00 on advertising, outreach, education, and credit counseling. ECF 6 ¶¶ 25, 28. As of the date of ESSA's brief, ESSA reports spending $61,500.00 toward the community partnership requirement and $139,956.13 toward its Advertising, Outreach, and Education Plan. ECF 16 at 4, 6. ESSA still must spend $63,500.00 for partnerships and $110,043.87 for outreach. These obligations remain unmet.

ESSA agreed to submit annual updates to the U.S., including partnership proposals and an Outreach Plan. ECF 6 ¶¶ 26–27, 29–30. ESSA's two years of compliance, ECF 16 at 4–5, does not amount to substantial compliance with a Consent Order that requires annual evaluations and updates throughout its five-year term.

ESSA agreed to advertise in certain majority-Black and Hispanic census tracts at least as much as in majority-white tracts, distribute targeted materials, include equal housing statements in all materials, and maintain a website section with loan information for those census tracts. ECF 6 ¶¶ 31–33, 40. ESSA's two years of compliance, ECF 16 at 5, does not amount to substantial compliance with a Consent Order that requires these obligations throughout its five-year term.

ESSA agreed to offer two annual programs for real estate professionals and two annual financial education seminars for residents in majority-Black and Hispanic census tracts. ECF 6 ¶¶ 34–37, 40. ESSA's two years of compliance, ECF 16 at 5–6, does not amount to substantial compliance with a Consent Order that requires annual programming throughout its five-year term.

***Monitoring.*** ESSA agreed to submit annual compliance reports to the U.S. ECF 6 ¶ 43. ESSA's two years of compliance, ECF 16, does not amount to substantial compliance with a Consent Order that requires annual compliance reports throughout its five-year term.

***Fair Lending Committee.*** ESSA agreed that its Fair Lending Committee will review Consent Order-related submissions, monitor compliance, and provide quarterly updates to the Board of Directors. ECF 6 ¶¶ 46–48. ESSA's two years of compliance, ECF 16 at 6, does not amount to substantial compliance with a Consent Order that requires quarterly updates and ongoing compliance monitoring and review of submissions, throughout its five-year term.

### C. ESSA's Spending Down the Loan Subsidy Fund Does Not Warrant Termination of the Consent Order

The "speed at which ESSA has" spent down the loan subsidy fund required by the Consent Decree is not a significant change in factual conditions. ECF 18 at 11. ESSA's spending down of the loan subsidy fund is, as amici note, "precisely what the parties and this Court would have expected when they entered into the Consent Order" and does not constitute a change in facts. ECF 8 at 14; see Rufo, 502 U.S. at 385 ("Ordinarily . . . modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree.").

That ESSA happened to spend down the loan subsidy fund before the five-year term of the Consent Order does not constitute a significant change in facts. As noted above, ESSA has multiple obligations under the Consent Order which the parties obviously understood and which still need to be implemented and are essential to the purpose of the Consent Order. Even if ESSA's spending down of the loan subsidy fund or the speed at which it did so constituted a change, this would not "render[] the prospective application of the [Consent Order] inequitable" and thus would not be significant. BCTC, 64 F.3d at 888 (citing Democratic Nat. Comm., 673 F.3d at 203).

### D. The Public Would Not Be Harmed By Continued Enforcement

Weighing any alleged hardship to ESSA against the benefits of continued enforcement and considering whether the Order's objectives have been achieved, termination of the Consent Order is not warranted. The U.S. contends that early termination of the Consent Order serves the public interest by avoiding "unreasonable or unnecessary burdens on financial institutions." ECF 18 at 12–13. However, neither the U.S. nor ESSA has shown by a preponderance of the evidence that continued enforcement of the Consent Order would harm the public interest. ESSA has identified no hardship, and the Court will assume the accuracy of amici's allegations based on ESSA's briefing and attachments. The Consent Order's purpose has not been achieved. The benefits of

continued enforcement are substantial: the Consent Order directly advances the goals of federal antidiscrimination law, delivers tangible benefits to the people of Philadelphia, and promotes the public interest in the finality and integrity of judicial remedies. BCTC, 64 F.3d at 888.

**E. No Party Put Forth Evidence of a Durable Remedy**

Even if ESSA has complied or attempted to comply in good faith with *some* of the terms of the Consent Order for the two years that it has been in place, the U.S. and ESSA did not offer to produce evidence demonstrating a lack of incentive for ESSA to redline if the Consent Order were terminated early and evidence to meet satisfy the U.S.' burden.[7] See Democratic Nat. Committee, 673 F.3d at 220. This lack of a durable remedy supports the denial of the Motion.

## IV. CONCLUSION

Neither the U.S. nor ESSA has presented facts warranting termination of the Consent Order. For the reasons stated herein, the uncontested[8] Motion to Terminate the Consent Order and Dismiss Action with Prejudice, ECF 8, is **DENIED**. An appropriate order follows.

\\adu.dcn\paed\PHL-DATA\Judge_Baylson\CIVIL 23\23-2065 USA v. ESSA Bank & Trust\23-2065 Memo on Motion to Terminate.docx

[7] At oral argument, amici emphasized that a risk-averse institution like ESSA is unlikely to continue complying with the terms of a terminated Consent Order. ESSA's counsel admitted uncertainty as to whether ESSA would maintain those activities. The U.S. suggested that future regulatory oversight could ensure fair lending compliance. In any case, the Court is not convinced that there exists a durable remedy which would justify early termination of the Consent Order.

[8] The Court notes that it need not grant a motion simply because the parties do not oppose the motion. A court may deny an unopposed or motion and may do so based on amici's arguments. See, e.g., Bureau of Consumer Fin. Prot. v. Townstone Fin., Inc., No. 20-cv-04176, slip. op. (N.D. Ill. June 12, 2025); Infineon Techs. N. Am. Corp. v. Mosaid Techs., Inc., 2007 WL 420194, at *3 (N.D. Cal. Feb. 5, 2007) (denying joint motion to vacate where it was opposed by amici).