Eli Segal
John S. Stapleton
STAPLETON SEGAL COCHRAN LLC
1760 Market Street, Suite 403
Philadelphia, PA 19103
215-561-1500
esegal@stapletonsegal.com

Benjamin Geffen
Daniel Urevick-Ackelsberg*
PUBLIC INTEREST LAW CENTER
2 Penn Center
1500 JFK Blvd., Suite 802
Philadelphia, PA 19102
267-546-1308
bgeffen@pubintlaw.org

Attorneys for *Amici Curiae*

*Pro hac vice*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff*, v. LAKELAND BANK, *Defendant*. | Civil Action No. 2:22-cv-5746-CCC |

## *AMICI CURIAE*'S BRIEF IN REPLY TO UNITED STATES' AND DEFENDANT'S BRIEFS IN SUPPORT OF DISMISSAL

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ...................................................................... ii

I.      INTRODUCTION ......................................................................1

II.     FACTS ....................................................................................1

III.    ARGUMENT............................................................................2

    A.      The United States fails to meet the standard for Rule 60 relief ...............2

        1.      Rule 60 controls the modification of consent orders ...........................2

        2.      Judgments are not satisfied with millions of dollars unpaid .................4

        3.      Substantial compliance is not achieved by piecemeal performance .....5

        4.      The United States' representations in ESSA further shut the door .......8

        5.      The United States seeks to make illegal the remedy it alleges is durable ...............................................................................9

        6.      The United States' attempt to terminate consent orders through ministerial motions does not provide it cover here ...........................11

    B.      Lakeland's alleged burden does not meet any standard for relief .........12

IV.     CONCLUSION.........................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*BLOM Bank SAL v. Honickman*,
  605 U.S. 204 (2025). .....................................................................................3

*Brenner v. Loc. 514, United Bhd. of Carpenters & Joiners of Am.*,
  927 F.2d 1283 (3d Cir. 1991) ......................................................................13

*CFPB v. Townstone Fin., Inc.*,
  350 F.R.D. 32 (N.D. Ill. 2025) ....................................................................14

*CFPB v. Trident Mortg. Co., LP*,
  No. 2:22-cv-2936-KNS (E.D. Pa. June 2, 2025).......................................11

*Churchill v. Star Enters.*,
  3 F. Supp. 2d 622 (E.D. Pa. 1998)................................................................5

*Coltec Indus. v. Hobgood*,
  280 F.3d 262 (3d Cir. 2002) .................................................................. 13, 14

*Flores v. Bondi*,
  803 F. Supp. 3d 1018 (C.D. Cal. 2025)........................................................5

*Francis v. N.J. Off. of L. Guardian*,
  No. 07-3558, 2009 WL 10712449 (D.N.J. June 11, 2009) ........................14

*Frew v. Janek*,
  780 F.3d 320 (5th Cir. 2015) ................................................................ *passim*

*Halderman v. Pennhurst State Sch.*,
  901 F.2d 311 (3d Cir. 1990) ...................................................................6, 12

*Kenny A. by Winn v. Dep't of Hum. Res.*,
  No. 1:02-CV-1686-TWT, 2025 WL 2476301 (N.D. Ga. Aug. 27, 2025) ............8

*NLRB v. Harris Teeter Supermarkets*,
  215 F.3d 32  (D.C. Cir. 2000)......................................................................13

*Peery v. City of Miami*,
   977 F.3d 1061 (11th Cir. 2020) ............................................................... 7

*Roddy v. Clemons*,
   No. A-2710-06T1, 2007 WL 3034251 (N.J. Super. Ct. App. Div. Oct. 19, 2007) 6

*Rouser v. White*,
   825 F.3d 1076 (9th Cir. 2016) ............................................................. 6, 8

*Rufo v. Inmates of Suffolk Cnty. Jail*,
   502 U.S. 367 (1992) .......................................................................... 3, 4

*Sec. & Exch. Comm'n v. Ripple Labs, Inc.*,
   No. 20 Civ. 10832, 2025 WL 2016756 (S.D.N.Y. June 26, 2025) ...................... 8

*Thompson v. HUD*,
   404 F.3d 821 (4th Cir. 2005) ............................................................... 3

*U.S. v. Bancorpsouth Bank*,
   No. 16-cv-118 (N.D. Miss. Jan. 27, 2020) .............................................. 12

*U.S. v. ESSA Bank & Tr.*,
   No. CV 23-2065, 2025 WL 2087776 (E.D. Pa. July 23, 2025) .................. *passim*

*U.S. v. Jackson*,
   511 F. App'x 200 (3d Cir. 2013) ........................................................... 5

*U.S. v. Maine*,
   No. 1:24-CV-00315, 2025 WL 3267693  (D. Me. Nov. 24, 2025) ............. 3, 4, 15

**Other Authorities**

12 C.F.R. 1002.8 .................................................................................. 10

Equal Credit Opportunity Act (Regulation B), 90 Fed. Reg. 50901, 50909
   (Proposed Nov. 13, 2025) (to be codified at 12 C.F.R. pt. 1002) ................. 10, 11

Fed. R. Civ. P. 60(b)(5) ........................................................................ 4

Fed. R. Civ. P. 60. ...................................................................................................2

Wright and Miller, § 2961 Modification of Injunctions, 11A Fed. Prac. & Proc.
    Civ. § 2961 (3d ed.) ............................................................................................3

## I.    INTRODUCTION

A request to terminate a consent order often requires a knotty analysis by a court that entails evaluating barriers to the order's completion and balancing a proposed modification against the aims of the order and the public interest.

Not here. Instead, the United States only asks this Court to deem this Consent Order "satisfied." But the reality is plainly to the contrary. This Consent Order still requires a financial institution to provide four million dollars more in subsidized mortgages for Newark-area residents and to adhere to nearly two more years of other programmatic mandates designed to remedy historical redlining the United States alleged it committed in majority-Black and -Hispanic neighborhoods.

The judgment is not satisfied. The Motion should be denied.

## II.    FACTS

As described in Lakeland's own filing, much of the Consent Order's demands remain ahead. This includes $4.25 million that Lakeland must distribute in loan subsidies to residents in formerly redlined areas in and around Newark. Dkt. No. 35 at 3. At $15,000 of subsidy per mortgage, *id*. at 4, this means loans still must be made to 283 additional families. Lakeland also must spend an additional $162,500 pursuant to the Order's Community Development Partnership Program, and nearly $300,000 on additional advertising, community outreach, consumer financial education, and credit counseling. *Id.* at 5.

1

But, as the parties fail to acknowledge, the work remaining on the Consent Order goes well beyond money. For approximately two more years, Lakeland must provide appropriate fair lending training to relevant staff. Dkt. No. 4 ¶¶ 10–11. It must employ a Community Development Officer who directly reports to Lakeland leadership and who has the obligation to monitor the efforts made pursuant to the loan subsidy fund, coordinate the bank's outreach efforts, and encourage more lending within majority-Black and -Hispanic census tracts. *Id.* ¶¶ 17–18. It must keep open, properly staff, and provide robust loan products at the bank branches that it opened pursuant to the Order. *Id.* ¶¶ 19–22. And it is enjoined from violating the fair lending laws the United States alleged it broke. *Id.* ¶ 1. Neither party suggests that these remaining steps are unimportant to combatting redlining.

## III.    ARGUMENT

### A.    The United States fails to meet the standard for Rule 60 relief

#### 1.    *Rule 60 controls the modification of consent orders*

The United States begins with the suggestion that this Court may terminate the Order through a generalized call to equity, rather than the heavily proscribed standards of Rule 60. *See* Fed. R. Civ. P. 60.

The United States is wrong. Rule 60 itself is "a codification of the universally recognized principle that a court has continuing power to modify or vacate a final decree." Wright and Miller, § 2961 Modification of Injunctions, 11A Fed. Prac. &

2

Proc. Civ. § 2961 (3d ed.). In other words, a "court's inherent authority to modify a consent decree or other injunction is now encompassed in Rule 60(b)(5)." *Thompson v. HUD*, 404 F.3d 821, 826 (4th Cir. 2005); *U.S. v. Maine*, No. 1:24-CV-00315, 2025 WL 3267693, at *5 (D. Me. Nov. 24, 2025) ("Rule 60(b) provides the governing framework for all post-judgment motions to modify or terminate judgments.").

The United States' suggestion that paragraph fifty-four of the Consent Order provides a workaround of Rule 60 is similarly misguided. That paragraph allows extensions of time for performance of the Order without court approval, while requiring court approval for any other modification. Dkt. No. 4 ¶ 54. But the source of law for that court approval is plain: Rule 60. *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992) ("[T]he prospective effect of such a judgment or decree will be open to modification where deemed equitable under Rule 60(b).").

In place of strict standards, the United States offers a theory with no bounds. For instance, whether a motion is joint is irrelevant to the Rule 60 analysis. *See* Dkt. No. 33 at 9–10. This means that under the United States' view, a party could avoid Rule 60 even for a contested motion, so long as that party invokes paragraph 54 of the Order. This is wrong: "It is Rule 60(b)'s standard—and *only* Rule 60(b)'s standard—that applies when a party seeks relief from final judgment." *BLOM Bank SAL v. Honickman*, 605 U.S. 204, 214 (2025). The United States' implication to the contrary "fail[s] to provide a cogent standard and would undermine the finality of

3

judgments." *Maine*, 2025 WL 3267693, at *5 (rejecting materially similar argument raised in a joint motion to modify a final judgment).

### 2.    *Judgments are not satisfied with millions of dollars unpaid*

"The vast majority of motions for modification and termination of consent decrees . . . invoke Rule 60(b)(5)'s third clause," *Frew v. Janek*, 780 F.3d 320, 327 (5th Cir. 2015), which permits a court to "relieve a party or its legal representative from a final judgment, order, or proceeding" if "applying it prospectively is no longer equitable," Fed. R. Civ. P. 60(b)(5). Under that third clause, "a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo*, 502 U.S. at 383. Then, "[i]f the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance." *Id.*

In a nearly identical setting, for a motion filed only days after this one, the United States invoked Rule 60(b)(5)'s third clause in arguing that the termination of a similar consent order was warranted. The court squarely rejected the claim, concluding that the "[Consent Order's] obligations serve the public interest and remain necessary until the Consent Order's full term is complete." *U.S. v. ESSA Bank & Tr.*, No. CV 23-2065, 2025 WL 2087776, at *4 (E.D. Pa. July 23, 2025); *see also id.* ("Ensuring equal access to credit is not only a legal mandate—it strengthens communities, serves the public, and advances economic justice.").

4

Rather than grapple with that decision, the United States retreats to novelty, invoking only the first clause of Rule 60(b)(5), which permits the termination of a judgment that "has been satisfied." It is a justification "raised far less often— typically when there is a dispute over the amount of the judgment," "almost never applied to consent decrees," *Frew*, 780 F.3d at 327, and doomed here from the start: A judgment is not "satisfied" where thousands of dollars remain to be paid, let alone millions. *See U.S. v. Jackson*, 511 F. App'x 200, 202 (3d Cir. 2013) (holding that where a party "neither disputes the amount of the judgment entered against him nor argues that he has paid the full amount of the judgment" the party has "not satisfied the outstanding judgment."); *Churchill v. Star Enters.*, 3 F. Supp. 2d 622, 623–24 (E.D. Pa. 1998) ("The dispute centers on the remaining $3,756.02 . . . . Defendants are obligated to pay to plaintiff the entire amount of the judgment . . . . Since defendants have not done so, their motion for relief from judgment under Rule 60(b)(5) will be denied."). The inquiry can end there.

### 3.     *Substantial compliance is not achieved by piecemeal performance*

The doctrine of substantial compliance, which allows satisfaction when there are "minor" or "trivial" omissions, *Flores v. Bondi*, 803 F. Supp. 3d 1018, 1029 (C.D. Cal. 2025), does not rescue the United States. That doctrine makes clear that piecemeal performance does not equal satisfaction. Rather, "[l]ike terms in a contract, distinct provisions of consent decrees are independent obligations, each of

5

which must be satisfied before there can be a finding of substantial compliance." *Rouser v. White*, 825 F.3d 1076, 1081 (9th Cir. 2016); *see also Roddy v. Clemons*, No. A-2710-06T1, 2007 WL 3034251, at *2 (N.J. Super. Ct. App. Div. Oct. 19, 2007) ("Good faith compliance with all important particulars of the contract is necessary for a finding of substantial performance.").

The Third Circuit's decision in *Halderman v. Pennhurst State School & Hospital* demonstrates how far Lakeland is from demonstrating satisfaction. 901 F.2d 311 (3d Cir. 1990). There, a county government was required to provide services to individuals with disabilities formerly living in a state institution. *Id.* at 315. The county argued that it was in substantial compliance because 194 of the hospital's 200 former residents were being properly cared for. *Id.* at 317. The Third Circuit held otherwise, affirming that "97% of [the] class members hav[ing] been provided with adequate services" was not good enough. *Id.* at 324. Progress may be admirable, but "merely taking significant steps toward compliance comes nowhere near satisfying [Rule 60(b)(5)'s] exacting standard." *Rouser*, 825 F.3d at 1082.

The cases the United States relies upon make this plain. For example, in *Frew*, the consent order was deemed satisfied because the "specific actions" that consent decree required were completed. 780 F.3d at 330. The Court did not need to consider any theoretical purpose of the agreement, because "[t]he whole point of negotiating and agreeing on a plethora of specific, highly detailed action plans was to establish

6

a clearly defined roadmap for attempting to achieve the Decree's purpose." *Id.* at 328 And because the defendants "fulfill[ed] the purpose of the Decree by implementing the broad range of supportive initiatives memorialized *in the Decree,*" the court granted the motion. *Id.*

Like in *Frew*, the roadmap here is clear. But unlike in *Frew*, the "specific actions" remain incomplete: The $4.25 million that remains to be spent in the loan subsidy fund, for example, will serve an additional 283 Newark-area families and is greater than the entire loan subsidy fund the United States required ESSA Bank to establish in that consent order. 2025 WL 2087776, at *2. Similarly, the $162,500 that remains unspent for community-based partnerships is larger than the entire amount that the United States required ESSA Bank to spend. *Id.* Moreover, the Consent Order's remedial terms mean that Lakeland must take nearly two more years' worth of affirmative steps to counteract years' worth of credit denial.[1]

Lakeland's failure to reach satisfaction is only underscored by its own statement that it "will commit to the spending of the remaining amount under the subsidy" because it recognizes the importance of the "benefit of this mortgage loan

---

[1] The cases regarding the City of Miami also provide the United States no support. There, courts considered a decree with a broad "core purpose" of "stop[ping] the criminalization of homelessness," weighed that purpose against twenty years of programmatic compliance efforts and $60 million annually that the city devoted to the cause, and determined the purpose satisfied. *Peery v. City of Miami*, 977 F.3d 1061, 1075 (11th Cir. 2020). Here, the Consent Order has specific, negotiated steps that remain to be completed.

7

subsidy to underserved communities." Dkt. No. 24-2. In other words, both parties acknowledge the importance of the Consent Order's unfinished business but seek to convert those terms from court-ordered obligations to unenforceable promises. This approach makes little sense, *see Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, No. 20 Civ. 10832, 2025 WL 2016756, at *3 (S.D.N.Y. June 26, 2025) ("Indeed, if the Court should not be concerned about Ripple violating the law, why do the parties want to eliminate the injunction that tells Ripple, 'Follow the law'?"), and fails to satisfy Rule 60(b)(5).

"Courts don't release parties from a consent decree unless they have substantially complied with *every one* of its provisions." *Rouser*, 825 F.3d at 1081; *see also Kenny A. by Winn v. Dep't of Hum. Res.*, No. 1:02-CV-1686-TWT, 2025 WL 2476301, at *5 (N.D. Ga. Aug. 27, 2025) (no substantial compliance despite "'positive trajectory' towards substantial compliance" and "good faith, meaningful progress"). This Consent Order, like that in *Frew*, will be satisfied when its "specific, highly detailed action plans," 780 F.3d at 328, are completed—but not before.

    *4.    The United States' representations in ESSA further shut the door*

Lest there be any doubt, the United States' representations in the *ESSA* matter resolves it. Like here, the *ESSA* consent order required a loan subsidy fund to assist homeowners. 2025 WL 2087776, at *4. But unlike here, ESSA fully paid the loan subsidy fund by the time the United States filed its motion to terminate the order. *Id.*

8

And according to the United States, the fact that ESSA Bank had "complete[d] the key component of the Consent Order—*full distribution of a $2.92 million loan subsidy fund*—in less than two years," was the central reason why that order should have been considered satisfied. *ESSA*, 2:23-cv-02065-MMB (E.D. Pa. July 17, 2025), Dkt. No. 18 at 12 (emphasis added).

Rather than explain how the judgment here could be satisfied when what it asserted in *ESSA* to be "the key component of the Consent Order" remains unfulfilled, the United States simply omits such an assertion here.[2]

> 5.  *The United States seeks to make illegal the remedy it alleges is durable*

There is another reason why this Court should be dubious about the United States' claim of a durable remedy: the United States is at this moment seeking to make this very sort of remedy illegal.

The Consent Order requires Lakeland to originate mortgages in "majority-Black and Hispanic census tract[s] in the Newark Lending Area," Dkt. No. 4 ¶ 25,

---

[2] The United States emphasized the centrality of this fact numerous times before the *ESSA* court, as evidence of everything from substantial compliance to a durable remedy to a changed circumstance. 2:23-cv-02065-MMB (E.D. Pa. July 17, 2025), Dkt. No. 18 at 6, 8, 9, 12, 13. The argument went nowhere with the *ESSA* court, which rejected the government's attempt to define any term as the "'most important' part of the Consent Order" and found instead that "[s]everal terms of the Consent Order remain unmet and/or require continued compliance over several years, and are highly relevant to achieving the Consent Order's purpose." 2025 WL 2087776, at *4 n.5.

which Lakeland is accomplishing through a special purpose credit program ("SPCP"), Dkt. No. 35 at 6. That is permissible under the Consumer Financial Protection Bureau's current regulations implementing the Equal Credit Opportunity Act, which provide that a lender can lawfully establish an SPCP for the benefit of a class of economically disadvantaged persons even if that lending program might otherwise violate ECOA's non-discrimination requirements. *See* 12 C.F.R. 1002.8. But the CFPB is currently proposing to prohibit SPCPs that "us[e] the prohibited basis of race, color, national origin, or sex, or any combination thereof, of the applicant, as the common characteristic in determining eligibility for the SPCP." Equal Credit Opportunity Act (Regulation B), 90 Fed. Reg. 50901, 50909 (Proposed Nov. 13, 2025) (to be codified at 12 C.F.R. pt. 1002).

There is little question that the United States would consider Lakeland's SPCP this sort of effort, because the same regulation defines illegal disparate treatment as "facially neutral criteria [that] function as proxies for protected characteristics designed or applied with the intention of advantaging or disadvantaging individuals based on protected characteristics." *Id.* at 50922. In other words, once the Rule becomes final, the United States will argue that a proxy for race—such as the racial makeup of a neighborhood, or the past redlining of it—cannot be used for "advantaging" individuals, even to remedy that redlining. And once the Rule

10

becomes final, lenders who have established these sorts of SPCPs will have ninety days to conform their operations. *Id.* at 50914.

While Lakeland expresses its intention to continue offering SPCPs voluntarily, the United States offers no assurances that Lakeland will be permitted to do so, and that silence speaks volumes in light of the CFPB's pending rulemaking. This Court should treat with extreme skepticism the representation of a party that simultaneously offers that there is a durable remedy that will persist without court oversight, while promulgating a rule which holds that remedy to violate the law.

6. *The United States' past successn terminating consent orders through ministerial motions does not provide it cover here*

The United States' citation to other consent orders that *were* terminated, whether during the current administration or before it, does not change the calculus. To start, each unexplained court order terminating a consent order since the beginning of 2025 was entered after the very same "atypical" "posture of this litigation" that this Court noted, with an "unopposed motion to terminate a comprehensive consent order, which could have significant consequences," Dkt. No. 32 at 5, presented to a district court without the benefit of adversarial briefing. *See, e.g.*, *CFPB v. Trident Mortg. Co., LP*, No. 2:22-cv-2936-KNS (E.D. Pa. June 2, 2025) (motion filed with no opposition).

By contrast, the orders that were terminated prior to the current administration were done so pursuant to terms in those orders which set clearly defined conditions

for early termination. *See, e.g., U.S. v. Bancorpsouth Bank*, No. 16-cv-118 (N.D. Miss. Jan. 27, 2020), Dkt. No. 15 at 1 (consent order allowed for termination after three years "if Defendant has fully complied with all its terms, including, but not limited to, the disbursement of all funds in the Loan Subsidy Program").

In interpreting consent orders, courts start with the "four corners of the agreement." *Pennhurst*, 901 F.2d at 319. Given that precept, the *ESSA* court noted the importance of what the inclusion of those sorts of early termination terms demonstrates: that the United States was capable of "includ[ing] a clause in the Consent Order—as it has in other Consent Orders—that full satisfaction of the loan subsidy fund" or another specific term "would permit early termination of the Consent Order." 2025 WL 2087776, at *4 n.5. That the parties failed to do so does not mean this Court must do it for them.[3]

**B.   Lakeland's alleged burden does not meet any standard for relief**

Lakeland's allusions to the harm it is suffering from the continuance of the Consent Order fare no better. To the extent Lakeland's brief attempts an undeveloped reference to the more traditional Rule 60(b)(5) analysis, Lakeland fails to provide any law at all, and therefore waives the issue. *See, e.g.*, *Brenner v. Loc.*

---

[3] As explained above, the Order's provision for court-approved modifications does not bestow the parties with the ability to modify the order in a manner inconsistent with Rule 60.

12

*514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1298 (3d Cir. 1991) ("[F]ailure to raise an issue in the district court constitutes a waiver.").[4]

Regardless, Lakeland comes nowhere close to meeting the standard for relief. For example, while Lakeland protests that it still "must reassure the market of its compliance posture . . . and provid[e] periodic updates to federal and state regulators," Dkt. No. 35 at 8, "hurdles inherent in a consent decree's entry do not count as 'obstacles'" under Rule 60. *NLRB v. Harris Teeter Supermarkets*, 215 F.3d 32, 36 (D.C. Cir. 2000). Lakeland "may wish that it had not made [a] deal, but courts have not looked favorably on the entreaties of parties trying to escape the consequences of their own 'counseled and knowledgeable' decisions." *Coltec Indus. v. Hobgood*, 280 F.3d 262, 274 (3d Cir. 2002).

Lakeland also alleges that, because this Motion was filed in the first instance, Lakeland will suffer "reputational harm" if the Motion is not granted. Dkt. No. 35 at 7 ("A denial would thus result in reputation harm that would not have existed had the Consent Order simply run its 5-year course."). Lakeland, of course, supported this motion to begin with. Accordingly, even were Lakeland's allegation of

---

[4] Lakeland would have to establish the right to a modification by demonstrating a significant change in factual conditions or law, that the Consent Order became unworkable because of unforeseen obstacles, or that continued enforcement of the Consent Order would be detrimental to the public interest. *DNC v. RNC*, 673 F.3d 192, 202 (3d Cir. 2012). And even then, it would still need to offer a "proposed modification [that] is suitably tailored to the changed circumstances." *Rufo*, 502 U.S. at 369. It has done none of this.

reputational harm more than supposition, the alleged harm is "a failing of [its] own making," *Francis v. N.J. Off. of L. Guardian*, No. 07-3558, 2009 WL 10712449, at *2 (D.N.J. June 11, 2009) (denying Rule 60 relief), which cannot come close to offsetting the public interest in completion of an anti-redlining consent order.[5] In any event, the premise of Lakeland's argument is wrong. Because Rule 60(b) relief is exceptional and requires a steep showing, the denial of such relief does not indicate that Lakeland has thus far failed to comply with the Order or has otherwise done something wrong.

Finally, Lakeland's suggestion that this is a private matter between two parties is wrong. Dkt. No. 35 at 8. "[C]onsent orders are final judicial determinations—not mere policy statements subject to reversal at the discretion of a changing Executive Administration." *ESSA*, 2025 WL 2087776, at *1 n.1. That is even more so when "[d]efendants' alleged wrongdoing affected the public," *CFPB v. Townstone Fin., Inc.*, 350 F.R.D. 32, 37 (N.D. Ill. 2025), for a matter "[r]ooted in the mandates of federal law and the protections of the U.S. Constitution." *ESSA*, 2025 WL 2087776, at *4.

---

[5] Lakeland's assertion that it has gone "above and beyond the terms of the Consent Order to ensure the success of its loan subsidy commitment," Dkt. No. 35 at 4, carries no weight. A sophisticated party that enters into a consent order is responsible for taking necessary steps to effectuate it. *See, e.g.*, *Coltec Indus.*, 280 F.3d at 274 (parties must abide by their "counseled and knowledgeable decisions").

Parties are free to settle their matters privately. But "[w]hat distinguishes a consent decree from a private settlement is that the parties to a consent decree expect and achieve a continuing basis of jurisdiction to enforce the terms of the resolution of their case in the court entering the order." *Maine*, 2025 WL 3267693, at *7 (citation modified). "The integrity of the judicial process and public confidence in the rule of law," not the wishes of parties, "remain paramount." *ESSA*, 2025 WL 2087776, at *1 n.1.

The standards for modifying a consent order—let alone an order entered in the public interest, Dkt. No. 4 at 2,—are what is before this Court, not the wishes of any party. Lakeland's failure to provide an analysis of those standards forecloses its efforts.

## IV.  CONCLUSION

The United States' Motion to terminate the Consent Order fails to meet the Rule 60(b)(5) standard for relief. It should be denied.

Dated: February 11, 2026

Respectfully submitted,

By: */s/ Eli Segal*
Eli Segal
John S. Stapleton
STAPLETON SEGAL COCHRAN LLC
1760 Market Street, Suite 403
Philadelphia, PA 19103
215-561-1500
esegal@stapletonsegal.com

Benjamin Geffen
Daniel Urevick-Ackelsberg*
PUBLIC INTEREST LAW CENTER
2 Penn Center
1500 JFK Blvd., Suite 802
Philadelphia, PA 19102
267-546-1308
bgeffen@pubintlaw.org

Attorneys for *Amici Curiae*

**Pro hac vice*

## CERTIFICATE OF SERVICE

I, Eli Segal, hereby certify that on this date, I caused the foregoing document to be filed electronically with this Court, where it is available for viewing and downloading from the Court's ECF system by the Court and all parties.


Dated: February 11, 2026                    By: */s/ Eli Segal*
                                                 Eli Segal