**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> LAKELAND BANK, <br><br> Defendant. | No. 22-cv-5746 <br><br> **OPINION & ORDER** |

**CECCHI, District Judge.**

Before the Court is plaintiff United States of America's (the "Government") motion to (1) terminate a consent order between it and defendant Lakeland Bank ("Lakeland") and (2) dismiss this action.[1]  ECF No. 9.  Amici Curiae New Jersey Citizen Action Education Fund, Housing Equality Center of Pennsylvania, and National Fair Housing Alliance ("Amici") opposed the motion, ECF No. 33 ("Amicus Br."), the Government and Lakeland replied, ECF No. 34 ("Gov't Reply Br."); ECF No. 35 ("Lakeland Reply Br."), and Amici responded to those replies, ECF No. 38 ("Amici Sur-Reply Br.").  The Court decides the motion without oral argument.  Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b).  For the reasons stated below, the Court will deny the Government's motion without prejudice.

## I.    BACKGROUND

On September 28, 2022, the Government filed a complaint against Lakeland, alleging that the bank had discriminated in its "residential mortgage lending."  ECF No. 1 ¶ 1. Specifically, the Government alleged that between 2015 and 2021, Lakeland "engaged in a pattern or practice of unlawful redlining"; "avoided providing home loans and other mortgage services in majority-

---

[1] On May 16, 2024, Provident Bank acquired Lakeland and "assumed the responsibility for the requirements of the Consent Order."  ECF No. 9 at 2 n.1.  Nonetheless, the Court will still refer to defendant as Lakeland.

Black and Hispanic neighborhoods in . . . Newark"; and "engaged in acts or practices directed at applicants and prospective applicants that discouraged those living in, or seeking credit to purchase properties in, these neighborhoods from seeking or applying for credit from Lakeland." *Id.* ¶ 4. Based on this alleged discrimination, the Government brought claims under the Fair Housing Act and the Equal Credit Opportunity Act. *Id.* ¶¶ 53–63.

On September 29, 2022, the Court entered a consent order dated September 27, 2022, that "resolve[d] all claims . . . filed in [the] Complaint." ECF No. 4 at 1. Through the consent order, Lakeland made guarantees related to lending practices; fair lending compliance and training; community development partnership programs; and advertising, community outreach, consumer financial education, and credit counseling initiatives. *Id.* at 3–14. Lakeland also agreed to conduct a community credit needs assessment study, designate a community development officer, expand into majority-Black and Hispanic census tracts, and create a $12 million loan subsidy fund. *Id.* The consent order also provided for a comprehensive evaluation and monitoring protocol whereby Lakeland would "submit annual reports to the United States on its progress in complying with the terms of th[e] Consent Order and associated plans and programs." *Id.* at 15. The consent order provided that it would "remain in effect for five years"—unless Lakeland "ha[d] not invested all money in the loan subsidy fund," in which case the consent order would "remain in full effect until three months after Lakeland has invested all the money in the loan subsidy fund and ha[d] submitted a final report to the United States that demonstrates the fulfillment of [its loan subsidy fund] obligation." *Id.* at 17.

On May 28, 2025, the Government requested early termination of the consent order and dismissal of the case. ECF No. 9. In support of the motion, which Lakeland did not oppose, the Government "advise[d] the Court that Lakeland . . . ha[d] demonstrated a commitment to

2

remediation and ha[d] reached substantial compliance with the monetary and injunctive terms of the Consent Order." *Id.* at 2.

On June 1, 2025, Amici moved for leave to appear and file a brief. ECF No. 10. After the parties briefed that motion, *id.*; ECF Nos. 23–25, the Court granted Amici leave to oppose the Government's motion to terminate the consent order and dismiss the case, ECF No. 32. In its Order granting leave, the Court set a briefing schedule for the Government and Lakeland to reply. *Id.* On February 4, 2026, both the Government and Lakeland replied to Amici's brief. Gov't Reply; Lakeland Reply. A week later, Amici sought leave to respond to those replies, ECF No. 36, which the Court provided on March 5, 2026, ECF No. 37. Pursuant to that grant of leave, Amici filed a sur-reply on March 5, 2026. Amici Sur-Reply.

## II.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 60(b)(5) allows a court to "relieve a party or its legal representative from a final judgment, order, or proceeding" if (1) "the judgment has been satisfied, released, or discharged," (2) "it is based on an earlier judgment that has been reversed or vacated," or (3) "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). Consistent with that rule, "a party seeking modification [or termination] of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992). To meet this burden, the movant "must establish at least one of the following four factors by a preponderance of the evidence:" (1) "a significant change in factual conditions," (2) "a significant change in law," (3) "that 'a decree proves to be unworkable because of unforeseen obstacles,'" or (4) "that 'enforcement of the decree

3

without modification would be detrimental to the public interest.'" [2] *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 202 (3d Cir. 2012) (quoting *Rufo*, 502 U.S. at 384).

III.    **DISCUSSSION**

For purposes of this motion, most of the relevant evidence and arguments come from (1) the parties' briefing on whether the Court should grant leave to Amici to participate and (2) the Government and Lakeland's responses to Amici's brief.    The Court will evaluate the Government's and Lakeland's arguments in turn.    For the reasons stated below, the Court will deny the Government's motion to terminate the consent order and dismiss the case, because neither the Government nor Lakeland have put forth sufficient evidence to satisfy the burden outlined above. *See United States v. Essa Bank & Tr.*, No. 23-2065, 2025 WL 2087776, at *5 n.8 (E.D. Pa. July 23, 2025) ("A court may deny an unopposed . . . motion and may do so based on amici's arguments.").

---

[2] The Government correctly notes "the well-settled principle that a court retains the inherent authority to terminate or modify a consent decree as an exercise of that court's equitable power." Gov't Reply Br. at 5 (citing *Holland v. N.J. Dep't of Corr.*, 246 F.3d 267, 270 (3d Cir. 2001)); *see also Sec. & Exch. Comm'n v. Liberty*, No. 22-2165, 2024 WL 2717717, at *4 (3d Cir. May 28, 2024) (Matey, J., concurring) ("A federal court can modify a consent judgment as specified in the agreement, by party motion under Federal Rule of Civil Procedure Rule 60(b), or through the exercise of the court's inherent equitable power."). However, courts generally exercise that equitable power only in light of "changed conditions," much like the Court's power under Rule 60(b). *Holland*, 246 F.3d at 270; *see, e.g.*, *Liberty*, 2024 WL 2717717, at *4. Indeed, several courts of appeals have recognized that Rule 60(b)(5) "encompasse[s]" a "court's inherent authority to modify a consent decree or other injunction." *Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, 404 F.3d 821, 826 (4th Cir. 2005); *see also, e.g.*, *Tapper v. Hearn*, 833 F.3d 166, 170 (2d Cir. 2016); *Bellevue Manor Assocs. v. United States*, 165 F.3d 1249, 1252 (9th Cir. 1999); *Money Store, Inc. v. Harriscorp Finance, Inc.*, 885 F.2d 369, 372 (7th Cir. 1989); *Fortin v. Comm'r of Mass. Dep't of Pub. Welfare*, 692 F.2d 790, 799 n.12 (1st Cir. 1982); *Booker v. Special Sch. Dist. No. 1, Minneapolis, Minn.*, 585 F.2d 347, 352 (8th Cir. 1978).

## A.      The Government's Arguments for Termination

The Government argues that termination is appropriate because Lakeland has substantially complied with the consent order.[3]  Gov't Reply Br. at 6–11; *see also* Lakeland Reply Br. at 1–6 (outlining compliance); ECF No. 24 at 1–5 (similar).  But Lakeland's existing compliance—at least on the current record—does not present a change in condition that can justify termination of the consent order.  *See Rufo*, 502 U.S. at 385 ("Ordinarily . . . modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree."); *Henderson v. Morrone*, 214 F. App'x 209, 214–15 (3d Cir. 2007).

Although a party's substantial performance (*i.e.*, substantial compliance) with a consent order can justify its termination, Lakeland's "partial satisfaction of the [c]onsent [o]rder does not" mean that the bank has substantially performed its obligations under the order.  *Essa Bank*, 2025 WL 2087776, at *4; *see Miles v. Aramark Corr. Serv., Inc.*, 321 F. App'x 188, 191 (3d Cir. 2009) (noting, in the context of a consent order, that "substantial performance" occurs where "actual performance is so similar to the required performance that any breach that may have been committed is immaterial" (citation omitted)); *see also Peery v. City of Miami*, 977 F.3d 1061, 1075 (11th Cir. 2020) ("Substantial performance, or substantial compliance, exists when the consent decree's fundamental purpose has been accomplished, and any deviations from the decree are 'unintentional and so minor or trivial as not substantially to defeat the object which the parties

---

[3] The Government also cites the consent order's language providing that modifications "may be made 'upon approval of the Court, by motion of any party.'"  Gov't Reply Br. at 6 (quoting ECF No. 4).  The Government argues that this provision embodies a "bargained for" flexibility.  *Id.* at 7.  Although the Government is correct that "[a] federal court can modify a consent judgment as specified in the agreement," *Liberty*, 2024 WL 2717717, at *4 (Matey, J., concurring), this contractual language simply recognizes the parties' ability to ask the Court to modify the consent order under Rule 65 or the Court's inherent authority, *Apple Corps Ltd. v. Int'l Collectors Soc'y*, 15 F. Supp. 2d 456, 468 (D.N.J. 1998) ("Consent decrees are interpreted under ordinary contract law principles." (citation omitted)).

5

intend[ed] to accomplish.'" (alteration in original) (citation omitted)).  As the Government notes, the consent order was "designed to remediate harm to redlined census tracts by facilitating application of a lender's existing business model to those specific tracts."  Gov't Reply Br. at 2. To achieve this remedial objective, the consent order codified many independent provisions— some of which outline *annual* obligations over the order's five-year term—that *together* remedy the harms identified by the Government in the complaint.  *See Essa Bank*, 2025 WL 2087776, at *4 ("Several terms of the Consent Order remain unmet and/or require continued compliance over several years and are highly relevant to achieving the Consent Order's purpose."); *see also* Amicus Br. at 7 ("[M]any of the benefits of the Consent Order have yet to be fully realized.").

For example, the consent order requires Lakeland to (among other things) (1) spend $150,000 annually "on advertising, outreach, consumer financial education, and credit counseling in the Newark Lending Area," ECF No. 4 ¶ 30; (2) "create point-of-distribution materials, such as posters and brochures, targeted toward majority-Black and Hispanic census tracts to advertise products and services" and "place or display these promotional materials in its branch offices," *id.* ¶ 34; (3) "provide four outreach programs per year for real estate brokers and agents, developers, and public or private entities engaged in residential real estate-related business in majority-Black and Hispanic census tracts to inform them of Lakeland's products and services and to develop business relationships," *id.* ¶ 36; and (4) "provide a minimum of four seminars per year targeted toward residents in majority-Black and Hispanic census tracts in its Newark Lending Area" covering "credit counseling, financial literacy, and other related education, to help identify and develop qualified loan applicants from those areas," *id.* ¶ 39.  With over a year left in the consent order's five-year term, *id.* ¶¶ 50–51, 63; *see also* Amicus Br. at 6, Lakeland's "ongoing [annual] obligations are not merely ancillary to the Consent Order's purpose considering the four corners

6

of the Consent Order—these obligations were put in place to directly address the exclusion and practices that the Consent Order was designed to remedy," *Essa Bank*, 2025 WL 2087776, at *4.

Similarly, the consent order required Lakeland to establish a $12 million loan subsidy fund "to increase credit for home mortgage loans, home improvement loans, and home refinance loans for consumers applying for loans in majority-Black and Hispanic census tracts in its Newark Lending Area." ECF No. 4 ¶ 23. According to the parties' submissions, Lakeland has disbursed approximately 65% of the loan subsidy fund so far, meaning that it must still disburse the remaining 35% (or approximately $4.2 million). Gov't Reply Br. at 3, 8; *see* ECF No. 35-1 ¶ 10; Amici Sur-Reply Br. at 1. That is a sizeable, "[non-]trivial" portion of the loan subsidy fund. *Peery*, 977 F.3d at 1075 (citation omitted).

And finally, the consent order required Lakeland to establish two new bank branches in the Newark area. ECF No. 4 ¶¶ 19–20; *see also* Amicus Br. at 7; Gov't Reply Br. at 2. The Government maintains that Lakeland has opened such branches, Gov't Reply Br. at 3, but under the terms of the consent order, Lakeland must maintain them "for the term of the" consent order, *i.e.*, through late September 2027, ECF No. 4 ¶¶ 20, 50–51, 63; *see also* Amicus Br. at 6.

In a tacit acknowledgement of Lakeland's ongoing or unmet obligations, the Government highlights that Lakeland is committed to (1) "fair lending compliance," ECF No. 24-1 ¶ 4; *see also* ECF No. 35-1 ¶ 13, (2) "spending all required monies related to the loan subsidy fund," (3) "its community development partnership program, and its advertising [and] community outreach," and (4) its "consumer financial education activities," Gov't Reply Br. at 3, 3 n.4. But a promise to reach substantial compliance in the future is not substantial compliance. Once again, the presence of these existing obligations under the consent order show that what remains of the consent order is not "minor or trivial." *Flores v. Bondi*, 803 F. Supp. 3d 1018, 1029 (C.D. Cal. 2025) (citation

omitted); *see also Rouser v. White*, 825 F.3d 1076, 1081 (9th Cir. 2016) ("[D]istinct provisions of consent decrees are independent obligations, each of which must be satisfied before there can be a finding of substantial compliance. Accordingly, courts don't release parties from a consent decree unless they have substantially complied with every one of its provisions."). As such, Lakeland's commitment to fair lending compliance going forward does not change the fact that Lakeland has yet to substantially perform its obligations under the consent order.

### B.      Lakeland's Arguments for Termination

Lakeland makes three arguments in favor of termination, none of which allow the Court to terminate the consent decree. First, the bank argues that termination is appropriate because the "continued maintenance of the Consent Order subjects the Bank to reputational harm." Lakeland Reply Br. at 7 ("[T]here is a risk of a false impression that the Bank has somehow failed to adequately comply with the order."). As noted above, the consent order was designed to remedy the harm Lakeland inflicted on certain New Jersey communities. Gov't Reply Br. at 2 ("The Consent Order included provisions typical of redlining resolutions, which are designed to remediate harm to redlined census tracts by facilitating application of a lender's existing business model to those specific tracts."). And although it "neither admit[ted] nor denie[d] any of the allegations in the Complaint," Lakeland agreed to the terms in the consent order as being "consistent with Lakeland's legitimate business interests." ECF No. 4 at 2. So, without more, contentions as to reputational harm to Lakeland are insufficient to terminate a consent order with over a year left on its term.

Second, Lakeland argues that termination is appropriate because "continued maintenance of the Consent Order imposes ongoing and unnecessary supervisory, financial, and operational burdens on the Bank." Lakeland Reply Br. at 7. Once again, Lakeland agreed to the consent order as being "consistent with Lakeland's legitimate business interests." ECF No. 4 at 2. To be sure,

the consent order imposes burdens.  But Lakeland received a corresponding benefit for incurring these burdens: the consent order "resol[ved] . . . the claims asserted in the Complaint." *Id.*

Third, Lakeland argues that termination is appropriate because "considerations of equity favor prompt termination of the Consent Order."  Lakeland Reply Br. at 8.  On this point, Lakeland points out that the Government "has exercised its enforcement discretion" in seeking termination of the consent order and therefore argues that the consent order "operates solely to the detriment of the Bank without advancing the interest of the parties or the public."  *Id.*  The Court acknowledges Lakeland's stated "commitment to the communities it services."  ECF No. 35-1 ¶ 13.  But a promise to comply, given the circumstances here, does not "achieve [the consent order's] purpose" to the same degree as maintaining Lakeland's compliance via the consent decree.  *Essa Bank*, 2025 WL 2087776, at *4–5 ("The benefits of continued enforcement are substantial: the Consent Order . . . delivers tangible benefits to the people of Philadelphia, and promotes the public interest in the finality and integrity of judicial remedies.").  And in any event, Lakeland provides no concrete evidence in support of its view of the costs and benefits of early termination.

IV.    **CONCLUSION**

Accordingly, **IT IS** on this 31st day of July 2026;

**ORDERED** that the Government's motion to terminate the consent order and dismiss this action (ECF No. 9) is **DENIED** without prejudice.

**SO ORDERED**.

*/s/ Claire C. Cecchi*
**CLAIRE C. CECCHI, U.S.D.J.**

9